**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

NI PING                                                                                       CIVIL # 2:16-cv-01304

                Plaintiff

v.

NO, 1 GREAT WALL OF FULTON 168, et al.

                Defendants

**Attorney's affidavit in response/opposition to the plaintiff's motion for reconsideration**

I, Joseph LaCome, hereby state under penalty of perjury as follows:

This affidavit is in response to the pending motion for reconsideration. I have better things to do than deal with Ping, Morel, and the drama created from this case, and I would have otherwise ignored this, but Morel's false allegations against me require me to reply.

    **a. Counsel never made a claim to being a New York lawyer**

1.    I never represented myself as a "New York attorney." This is, unfortunately, Morel's attempt at scoring points with his new client and poisoning the well with the Court. His accusation is very easy to disprove.

2.    What really happened (which I should know, since I was there, and Morel was not) is I told the client from the beginning that I could only appear pro hac vice since I was not a New York lawyer, and that I would pay the appropriate fees and file the motion. The original complaint I filed has my out of state bar # on the signature block. I told the client there would be a slight delay in filing the case because I had to obtain certificates of good standing, and file the appropriate motions to appear pro hac vice. The client said he understood and had no issues. I also sent the client copies of the motion to appear pro hac vice, along with the complaint, and

amended complaint, which again, contains a signature block that has no reference to me being a licensed New York lawyer.

3. Further, the number the client called me on was a non-New York area code number. Most damning to Morel's meritless accusation, the client signed a contingency agreement with me. The agreement's first sentence states it is a contingency agreement pursuant to MO (Missouri) Supreme Court rule 4-1.5(c). I have included a copy of the contingency agreement (Exhibit A), which the client signed. I will also include copies of the original signatures once I obtain it from my records. I also told Ni Ping that I do not live in New York and do not frequently come to New York. So it should have been (and was) more than obvious to Ping, and virtually anyone else with a reasonably average intelligence, that I am not a New York attorney. Further, I also told the client after the summary judgment was granted that he did not "lose" the case. All he had to do is find a lawyer to re-file the case in state supreme Court, but that I was not interested in doing anything with it because the pro hac vice procedures for out of state attorneys in New York courts is very difficult. I was also not interested in representing the client further for reasons that will be stated below.

4. As to the Feb 16th statement to defendant counsel, that was just simply a mix-up, because at the time I was handling several restaurant-FLSA cases. I already had the documents scanned on this current case emailed to me weeks earlier, so while I did contact defendant's counsel on Feb 16th, I did not respond further to defendant counsel because I sorted the confusion out. I already had a draft of the SJ opposition, but by itself it really would not mean much without an affidavit from the plaintiff.

5. I had notified Ping after the December 2016 hearing and again at least two more times while the summary judgment motion was pending, to write out a letter (affidavit) concerning the

number of sales he personally observed at Great Wall, and informed him of the time to file the opposition. He did not do it. I suspect he did not because at the time he may have still been uneasy over what he disclosed to me and opposing counsel in the Court's hallway during the December, 2016 hearing. Now that time has passed, I suppose he has been emboldened. Since, through Morel, Ping has so thoroughly destroyed the attorney client relationship, I can disclose exactly what happened the day of that hearing. This does not violate any client confidentiality because the disclosure was made to opposing counsel by the plaintiff himself, and would have been otherwise disclosed during discovery.

### b. There are serious credibility issues concerning the plaintiff

6. When defendant counsel asked if we could settle the case the day of the hearing, I said I was always open to settling, it just all depends on the client. While negotiating for a settlement, Ping Ni had an outrageous settlement amount in mind..something close to $90,000. This is based on the damage calculations that presumed double FLSA damages. I told him that amount would never be agreed to on a settlement.

7. In the hallway outside of the Court, I spoke with the defendant counsel. The defendant was there as well. Ping was alongside me. Mr. Chuang said something related to Ping's tax returns, and asked if he worked for anyone else while working for Great Wall. I could see Ping lose his composure; he had this look of a deer caught in the headlights. I pulled Ping away from defendant counsel, and asked why Ping was so worried about his taxes. The client admitted to me that his tax returns showed he worked full-time for a *second* employer at the same time he worked for Great Wall. I asked how on earth he could have time to work for a second employer while working 75+ hours a week for Great Wall. Ping replied that he paid the second employer

3

to create a fraudulent form W-4 that showed he was working full time for the second employer, so that Ping could file income tax returns and obtain credit.

8. I told him this sounded completely absurd, that he should have told me this sooner because it destroys his credibility, and raises an issue over his claim of working 75+ hours a week for Great Wall. Because of this, I told him the case was not worth anything close to what he believed. I told him had I known this from the beginning I would have never wasted time on the case. I also told him that, even if he was telling me the absolute truth, it sounded so bizarre that no jury, or judge in a bench trial, would ever believe it, and further, since Ping looked so scared in front of the defendant attorney, the attorney would demand copies of the tax returns during discovery, and would tear Ping up on a deposition. Ping, still worried, asked if he could go to jail for paying an employer to file a fraudulent W-4. I said it's illegal, but I have no idea if this is something the IRS would pursue, and that I was just representing him on this FLSA case, and nothing else. I did mention to opposing counsel the tax return issue, and from what I remember Ping walked up next to me and made a feeble attempt to explain the "W4 purchase" to opposing counsel. When Ping left, defendant counsel pointed out the credibility issues with the plaintiff, which was more than obvious to me at that point. After that, I then told Ping to just cut his losses, settle for a smaller amount, and be done with this case. Ping insisted on his sky-high figure settlement, and no settlement was reached. Later, when the court, during the hearing more or less directed opposing counsel to file a summary judgment, the amount the defendant offered was deeply discounted, and I knew at that point it would never settle for anything close to what Ping had been dreaming of.

9. After the hearing, I walked with Ping to his car and explained to him what a summary judgment is, and what a material issue of fact is, and how important it would be for him to have

4

an outline of what he observed concerning the amount of dishes served and work that was passing through the business to prove (indirectly) that the business earned over $500,000. I told him he needed to write out details, because that is required in an affidavit to oppose a summary judgment. I am still waiting for that statement from Ping, which he never produced, and which prevented me from filing a summary judgment. I noticed in Ping's pro se filing to reconsider he refers to some magical evidence that will prove Great Wall earned over $500,000 per year. I have no idea what it is, and I doubt it exists, because he did not mention it to me when we spoke about the summary judgment.

10. What is very troubling about this is that I told Mr. Morel about this case, and concerning Ping's credibility, back in early January 2017. I brought this to Morel's attention because Morel has been a lawyer longer than me, and I had not yet run into a client that had so seriously screwed up his own case, so I was curious what Morel thought of it. So, I am incredibly surprised that Morel would then represent this client, knowing full well of these credibility issues. In my opinion, the fraudulent W-4 issue completely kills the plaintiff's claims against Great Wall.

### c. Disqualification is neither necessary nor appropriate

11. Continuing with Morel's outrageous claims, he states I am "communicating" with the client. The last time I contacted Ni was through email in May, 2017, and I believe one phone-call around July. This was not through a third party. Ping has said nothing to me, and since he is a big boy, I believe if he was "offended" or had his feelings hurt by an email following up on his dismissed case, sent three months ago, he could have said something. Morel's claim to disqualify me on some unsubstantiated statements that I'm still attempting to speak to the client through some third party should be seen by the Court as absurd on its face.

12.     Now the court knows the truth, it is my hope that the Court acts accordingly concerning the plaintiff's motion for consideration.  I also request an order allowing me to withdraw from representing the client for the above stated reasons, and because the client and his new attorney are engaging in a course of conduct that is repugnant to me.


    Dated 8/23/17


/s/ Joseph LaCome_____
Joseph LaCome, attorney